## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

In Re:

Susan M. Moroni,

                Debtor.

_____

Ford Motor Credit Company LLC,

                Plaintiff,

vs.

Susan M. Moroni,

                Defendant.

_____

Chapter 7
Case No. 13-02610
Honorable Daniel R. Cassling

Adversary Proceeding No. _____

## COMPLAINT OBJECTING TO DISCHARGEABILITY OF DEBT

NOW COMES Plaintiff, Ford Motor Credit Company LLC ("Ford Credit" or "Plaintiff"), by and through its counsel, Dykema Gossett PLLC, and for its complaint objecting to the dischargeability of its debt ("Complaint") against the Defendant, Susan M. Moroni ("Defendant" or "Moroni"), hereby states as follows:

## INTRODUCTION

1.     By this complaint, Plaintiff objects to the dischargeability of the debt Defendant owes to Plaintiff in the amount of Two Million Seven Hundred Ninety-Seven Thousand Seven Hundred Sixty-Eight Dollars and 09/100's ($2,797,768.09). Defendant owes that sum because Defendant is a personal guarantor of indebtedness owed for two dealerships, Elm Ford Lincoln Mercury and Melrose Lincoln Mercury. At these dealerships, Defendant was an officer and/or

owner and was personally responsible for re-directing monies owed to Plaintiff to herself, others and elsewhere.

2.       Moreover, monies are owed to Plaintiff because of Defendant's involvement with the Elmhurst Lincoln Mercury dealership.   During her ownership of the Elmhurst Lincoln Mercury dealership, Defendant was personally responsible for re-directing monies owed to Plaintiff to herself, others and elsewhere.

3.       Now that Defendant has willfully and maliciously sold vehicles out of trust, sold returned lease vehicles in violation of a temporary restraining order and refused to reimburse Ford Credit, Defendant seeks to use bankruptcy as a shield to prevent Ford Credit from collecting on its outstanding debt from Defendant's financial misconduct.

## THE PARTIES

4.       Plaintiff, Ford Motor Credit Company LLC ("Ford Credit"), is a Delaware corporation with its principal place of business in Dearborn, Michigan.  Ford Credit also does business in the State of Illinois.  Ford Credit is a creditor of Defendant.

5.       Defendant, Susan M. Moroni, is an individual residing in Illinois, and is the Chapter 7 debtor in the above-referenced bankruptcy case.

6.       At all relevant times, Defendant was an owner of Melrose Lincoln Mercury ("Melrose"), a Delaware corporation with its principal place of business in Melrose Park, Cook County, Illinois.

7.       At all relevant times, Defendant was the owner and one of two individuals with full managerial authority over the operation of Elm Ford, Inc. ("Elm"), an Illinois corporation with its principal place of business in Newark, Kendall County, Illinois.

8.      At all relevant times, Defendant was an owner and officer of Elmhurst Lincoln-Mercury, Inc. ("Elmhurst"), a Delaware corporation with its principal place of business in Elmhurst, DuPage County, Illinois.

## JURISDICTION AND VENUE

9.      On January 23, 2013 (the "Petition Date"), Defendant filed a Petition, under Chapter 7 of the United States Bankruptcy Code ("Petition"), in the United Stated Bankruptcy Court for the Northern District of Illinois, Case No. 13-02610.

10.      This action is brought pursuant to 11 U.S.C. §§ 523(a)(4), 523(a)(6) and Bankruptcy Rule 7001(6).

11.      This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§1331 and 1334.

12.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(I).

13.      Venue is appropriate in this Court pursuant to 28 U.S.C. §1409(a).

## GENERAL FACTUAL ALLEGATIONS

### A. MELROSE LINCOLN MERCURY

14.      Melrose operated as an automobile dealership at 1600 W. North Avenue, Melrose Park, Illinois.

15.      On or about November 24, 1997, Melrose entered into a Wholesale Automotive Financing and Security Agreement with Ford Credit ("Wholesale Agreement"), which allowed Melrose to receive financing from Ford Credit for the purchase of its floor plan of vehicles. *See* Exhibit 1, Wholesale Automotive Financing and Security Agreement dated November 24, 1997.

16.     On or about November 24, 1997, Melrose executed a Security Agreement which identified certain secured interests offered by Melrose as collateral for the financing.  *See* Exhibit 2, Security Agreement between Ford Credit and Melrose dated November 24, 1997.

17.     Under the Security Agreement and the Wholesale Agreement, Ford Credit was granted a security interest in Melrose's property, wherever located, and the proceeds and products thereof.

18.     Specifically, the Security Agreement provides that:

> For a good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged the undersigned, Melrose Lincoln Mercury. . . hereby grants unto Ford Motor Credit Company, . . . a security interest in the following types of property wherever located, now owned or hereinafter acquired by the undersigned (hereinafter the "Collateral") and the proceeds and products thereof:
>
> (a)     all furniture, fixtures, machinery and other equipment.
>
> (b)     All motor vehicles, tractors, trailers, implements, service parts and accessories and other inventory of every.
>
> (c)     All accounts, contract rights, chattel paper and general intangibles.

*See* Exhibit 2.

19.     Moreover, the Wholesale Agreement provides that:

> **9. Default**
> The following shall constitute an Event of Default hereunder:
> (a)     Dealer [Melrose] shall fail to promptly pay any amount now or hereafter owing to Ford Credit as and when the same shall become due and payable,
>
> *   *   *
>
> Upon the occurrence of an Event of Default Ford Credit may accelerate, and declare immediately due and payable, all or any part of the unpaid balance of all Advances made hereunder together with accrued interest and flat charges without notice to anyone.  In addition, Ford Credit may take immediate possession of all property in which it has a security interest hereunder, without demand or other notice and without legal process. . . .

\* \* \*

*See* Exhibit 1, Wholesale Agreement, ¶ 9.

20.    Furthermore, on or about December 1, 2003, Defendant, along with John Moroni and David Mears, executed a Continuing Guaranty, whereby they personally agreed to pay any and all of Melrose's obligations to Ford Credit upon Melrose's default or failure to pay any of its obligations to Ford Credit.  *See* Group Exhibit 3, Continuing Guaranty executed by John Moroni, Susan Moroni and David Mears, dated December 1, 2003.

21.    The Continuing Guaranty provides, in relevant part that,

> . . . the undersigned Guarantor[] hereby, jointly and severally, and unconditionally, guaranties to [Ford Credit], [its] successors or assigns the Dealer will fully, promptly and faithfully perform, pay and discharge all Dealer's **present and future obligations** to [Ford Credit]; and agrees, without [Ford Credit] first having to proceed against Dealer or to liquidate paper or any security therefore, to pay on demand all sums due and to become due to [Ford Credit] from Dealer **and all losses, costs, attorney's fees or expenses which [Ford Credit] may suffer by reason of Dealer's default** . . ..

*See* Exhibit 3 (emphasis added).

22.    In January 18, 2006, Melrose was indebted to Ford Credit under the Wholesale Agreement in the principal amount in excess of $700,000.

23.    Melrose defaulted on the Wholesale Agreement by, among other things, selling vehicles and failing to repay Ford Credit for the loans to acquire those vehicles.  Such sales are commonly referred to in the industry as vehicles "sold out of trust" or "SOT" vehicles.

24.    Upon information and belief, vehicles were willfully and intentionally sold out of trust.  The dealership concealed the sale of said vehicles from Ford Credit to avoid payment of sale proceeds to Ford Credit.  The sale of the vehicle triggers the dealer's obligation to pay off the wholesale balance.

25.     Moreover, upon information and belief, instead of remitting payment to Ford Credit, sale proceeds were used by Defendant for personal reasons.

26.     Ford Credit attempted to collect the monies owed to it by Melrose.  However, Melrose refused to pay the defaulted amount and also failed to enter into a Forbearance Agreement for the past due amount.

27.     Whereas Ford Credit was successful in recovering some of its losses, Melrose remains indebted to Ford Credit in excess of $200,000.

28.     The foregoing outstanding debt was incurred in large part because Defendant's company knowingly, willfully and maliciously intended to deprive Ford Credit of its funds and did sell vehicles out of trust.

29.     The willful and malicious selling of vehicles out of trust amounted to a conversion of the vehicles by Melrose.

30.     Demand for payment was made upon Defendant, but Defendant refused to pay the amount due, notwithstanding her personal guaranty.

## B. ELM FORD LINCOLN MERCURY

31.     Elm operated an automobile dealership at Route 71, Newark, Kendall County, Illinois.

32.     On or about September 18, 2002, Elm entered into a Wholesale Automotive Financing and Security Agreement with Ford Credit ("Wholesale Agreement"), which allowed Elm to receive financing from Ford Credit for the purchase of its floor plan of vehicles.  *See* Exhibit 4, Wholesale Automotive Financing and Security Agreement dated September 18, 2002.

33.     Also, on or about September 18, 2002, Elm executed a Security Agreement which identified certain secured interests offered by Elm as collateral for the financing.  *See* Exhibit 5, Security Agreement between Ford Credit and Elm dated September 18, 2002

6

34.    Under the Security Agreement and the Wholesale Agreement, Ford Credit was granted a security interest in Elm's property, wherever located, and the proceeds and products thereof.

35.    Specifically, the Security Agreement provides that:

> For a good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged the undersigned, Elm Ford Inc.. . . hereby grants unto Ford Motor Credit Company, . . . a security interest in the following types of property wherever located, now owned or hereinafter acquired by the undersigned (hereinafter the "Collateral") and the proceeds and products thereof:
>
> (a)    all equipment, fixtures, furniture, demonstrators and service vehicles, supplies and machinery and other good of every kind.
>
> (b)    All motor vehicles, tractors, trailers, service parts and accessories and other inventory of every kind and accessions thereto.
>
> (c)    All accounts, instruments, chattel paper, general intangibles, contract rights, documents and supporting obligations thereto.

*See* Exhibit 5.

36.    Moreover, the Wholesale Agreement provides that:

> **9. Default**
> The following shall constitute an Event of Default hereunder:
> (a)    Dealer [Elm] shall fail to promptly pay any amount now or hereafter owing to Ford Credit as and when the same shall become due and payable,
>
> *    *    *
>
> Upon the occurrence of an Event of Default Ford Credit may accelerate, and declare immediately due and payable, all or any part of the unpaid balance of all Advances made hereunder together with accrued interest and flat charges without notice to anyone.  In addition, Ford Credit may take immediate possession of all property in which it has a security interest hereunder, without demand or other notice and without legal process. . . .
>
> *    *    *

*See* Exhibit 4, Wholesale Agreement, ¶ 9.

7

37.      Furthermore, on or about October 7, 2002, Defendant, along with John Moroni, executed a Continuing Guaranty, whereby they personally agreed to pay any and all of Elm's obligations to Ford Credit upon Elm's default or failure to pay any of its obligations to Ford Credit.  *See* Exhibit 6, Continuing Guaranty executed by John Moroni and Susan Moroni.

38.      The Continuing Guaranty provides, in relevant part that,

> . . . the undersigned Guarantor[] hereby, jointly and severally, and unconditionally, guaranties to [Ford Credit], [its] successors or assigns the Dealer will fully, promptly and faithfully perform, pay and discharge all Dealer's ***present and future obligations*** to [Ford Credit]; and agrees, without [Ford Credit] first having to proceed against Dealer or to liquidate paper or any security therefore, to pay on demand all sums due and to become due to [Ford Credit] from Dealer ***and all losses, costs, attorney's fees or expenses which [Ford Credit] may suffer by reason of Dealer's default*** . . ..

*See* Exhibit 6 (emphasis added).

39.      In September of 2008, Elm was indebted to Ford Credit under the Wholesale Agreement in the principal amount in excess of $900,000.

40.      Elm defaulted on the Wholesale Agreement by, among other things, selling vehicles out of trust and failing to repay Ford Credit for the loans to acquire those vehicles.

41.      Upon information and belief, vehicles were willfully and intentionally sold out of trust.  The dealership concealed the sale of said vehicles from Ford Credit to avoid payment of sale proceeds to Ford Credit.  The sale of the vehicle triggers the dealer's obligation to pay off the wholesale balance.

42.      Moreover, upon information and belief, instead of remitting payment to Ford Credit, sale proceeds were used by Defendant for personal reasons.

43.      Ford Credit attempted to collect the monies owed to it by Elm.  However, Elm refused to pay the defaulted amount and also failed to enter into a Forbearance Agreement for the past due amount.

44.     On or about September 18, 2008, as a result of Elm's default and failure to cure the same, Ford Credit brought a Replevin action, styled *Ford Motor Credit Company v. Elm Ford*, Case No. 2008 L 68, in the Kendall County Circuit Court, against Elm to recover its security interest.

45.     On or about September 19, 2008, an Order of Replevin was entered in favor of Ford Credit.  As a result, Ford Credit took possession of vehicles, machines and equipment to which it held a security interest and liquidated the same.

46.     Notwithstanding the liquidation, Elm remains indebted to Ford Credit in excess of $400,000.

47.     The foregoing outstanding debt was incurred in large part because Defendant's company knowingly, willfully and maliciously intended to deprive Ford Credit of its funds and did sell vehicles out of trust.

48.     The willful and malicious selling of vehicles out of trust amounted to a conversion of the vehicles by Elm.

49.     Demand for payment was made upon Defendant, but Defendant refused to pay the amount due, notwithstanding her personal guaranty.

50.     In fact, Ford Credit filed a complaint in DuPage County, styled *Ford Motor Credit Company LLC v. Susan Moroni and John Moroni*, Case No. 2010 L 607, in order to recovery the outstanding debt owed by Defendant.

51.     On March 19, 2012, a judgment was entered against Defendant in the amount of $414,777.34.  *See* Exhibit 17, March 19, 2012 Court Order.  This amount remains unpaid.

## C. ELMHURST LINCOLN MERCURY

52.     Elmhurst operated as an automobile dealership at 150 W. Grand Avenue, Elmhurst, DuPage County, Illinois.  Elmhurst entered into an Automotive Wholesale Plan

Application for Wholesale Financing and Security Agreement ("Wholesale Agreement")

between the Dealership and Ford Credit on August 13, 1984.

Security Agreement and Wholesale Agreement

53.     Ford Credit and Elmhurst entered into a Security Agreement ("Security

Agreement") dated October 16, 1980.  *See* Exhibit 7, Security Agreement dated October 16,

1980.

54.     Ford Credit and Elmhurst also entered into an Automotive Wholesale Plan

Application for Wholesale Financing and Security Agreement ("Wholesale Agreement"), dated

August 13, 1984.  *See* Exhibit 8, Automotive Wholesale Plan Application for Wholesale

Financing and Security Agreement ("Wholesale Agreement"), dated August 13, 1984.

55.     Under the Security Agreement and the Wholesale Agreement, Ford Credit was

granted a security interest in Elmhurst's property, wherever located, and the proceeds and

products thereof.

56.     Specifically, the Security Agreement provides that:

> For a good and valuable consideration, the receipt and sufficiency of which is
> hereby acknowledged the undersigned, Elmhurst Lincoln-Mercury … hereby
> grants unto Ford Motor Credit Company, … a security interest in the following
> types of property located at the undersigned's place(s) of business set out
> above, or elsewhere, now owned or hereafter acquired by the undersigned
> (hereinafter the "Collateral") and the proceeds thereof:
>
> a)  All furniture, fixtures, machinery and other equipment.
>
> b)  All motor vehicles, tractors, trailers, implements, service parts and
>     accessories and other inventory of every kind
>
> c)  All accounts, contract rights, chattel paper and general intangibles.

*See* Exhibit 7, Security Agreement.

57.     Moreover, the Wholesale Agreement provides that:

**9. Default**
The following shall constitute an Event of Default hereunder:
    (a)    Dealer [Elmhurst] shall fail to promptly pay any amount now or hereafter owing to Ford Credit as and when the same shall become due and payable. . ..

\*   \*   \*

Upon the occurrence of an Event of Default Ford Credit may accelerate, and declare immediately due and payable, all or any part of the unpaid balance of all Advances made hereunder together with accrued interest and flat charges without notice to anyone. ***Additionally, Ford Credit may take immediate possession of all property in which it has a security interest hereunder, without demand or other notice and without legal process*** . . . .

\*   \*   \*

*See* Exhibit 8, Wholesale Agreement, ¶ 9 (emphasis added).

58.     At all relevant times, including the times when vehicles were sold out of trust and returned lease vehicles were sold without remitting proceeds to Ford Credit, Defendant was an officer and owner of Elmhurst.

59.     As of September 8, 2008, Elmhurst was indebted to Ford Credit under the Wholesale Agreement in the principal amount in excess of $3,000,000.

                <u>Defaults Under the Wholesale Agreement</u>

60.     Elmhurst defaulted on the Wholesale Agreement by, among other things, selling vehicles out of trust.

61.     Upon information and belief, vehicles were willfully and intentionally sold out of trust.  The dealership concealed the sale of said vehicles from Ford Credit to avoid payment of sale proceeds to Ford Credit.  The sale of the vehicle triggers the dealer's obligation to pay off the wholesale balance.

62.     Moreover, upon information and belief, instead of remitting payment to Ford Credit, sale proceeds were used by Defendant for personal reasons.

63.     Due to the wholesale defaults, Ford Credit demanded payment of, initially, the default amount and eventually the full, accelerated debt of Elmhurst.  As of September 8, 2008, Elmhurst had failed to remit a total of more than $3.6 million (which included, *inter alia*, interest owed) to Ford Credit.

64.     Notwithstanding Ford Credit's efforts, Elmhurst failed and refused to pay the amount owed to Ford Credit.

65.     On September 9, 2008, as a result of Elmhurst's default and failure to cure the same, Ford Credit filed a Replevin action in the Circuit Court of DuPage County, styled *Ford Motor Credit Company v. Elmhurst Lincoln Mercury*, Case No. 08 L 1011 ("Replevin Action"). In the Replevin Action, Ford Credit sought to recover its collateral under the Wholesale Agreement.

66.     On or about September 15, 2008, the Court granted Ford Credit's Replevin action, and Ford Credit subsequently replevied all vehicles from Elmhurst.  *See* Exhibit 9, September 15, 2008 Order of Replevin.

67.     After Ford Credit liquidated the collateral to mitigate its damage, Elmhurst continued to owe Ford Credit approximately $1,747,769.39, exclusive of attorney's fees and costs.

68.     The foregoing outstanding debt was incurred in large part because Defendant's company knowingly, willfully and maliciously intended to deprive Ford Credit of its funds and did sell vehicles out of trust.

69.     The willful and malicious selling of vehicles out of trust amounted to a conversion of the vehicles by Elmhurst.

70.     Elmhurst knew that its willful and malicious conversion of the vehicles would cause harm to Ford Credit, namely that Ford Credit would be prevented from recovering funds to pay off the outstanding debt owed by Elmhurst.

71.     Defendant, as owner and officer, along with the general manager and other officers of Elmhurst, have done all within their power to continually prevent Ford Credit from recovering the outstanding balance owed by Elmhurst.

<u>Defaults Under the Lease Agreements</u>

72.     In addition to the Wholesale Agreement, Ford Credit and Elmhurst entered into a Red Carpet Lease ("RCL") Agreement with Elmhurst.  Specifically, Ford Credit and Elmhurst entered into three (3) separate agreements: (1) the Retail Lease Plan, dated February 24, 1981 (attached hereto as Exhibit 10); (2) the Red Carpet Lease – WOR Plan, dated December 3, 1981 (attached hereto as Exhibit 11); (3) and the Red Carpet Lease Assignment, dated June 15, 1999 (attached hereto as Exhibit 12).

73.     Since the inception of the Red Carpet Lease Program, Elmhurst leased numerous vehicles to customers for a set term between 12 and 36 months, and assigned the leases to Ford Credit.  The lease vehicles were purchased by, and titled in the name of, Ford Credit. *See* Exhibit 11, preamble.

74.     Elmhurst refused to honor its obligations pursuant to the Retail Lease Plan, Red Carpet Lease and Red Carpet Lease Assignment (collectively, "RCL Agreements").

75.     After the commencement of the Replevin Action, Ford Credit learned that several vehicles that were leased under the RCL Plan prior to September, 2008 had been returned to Elmhurst without notification to Ford Credit.  Unbeknownst to Ford Credit, Elmhurst sold certain of these vehicles and failed to pay the sale proceeds to Ford Credit.

13

76.     Specifically, Elmhurst sold 13 vehicles, identified in Exhibit 13 attached hereto, either to the original lessee or to a different customer, but Elmhurst failed to pay Ford Credit the sale proceeds or, in the alternative, paid Ford Credit with a check that was returned unpaid due to insufficient funds.  The total pay-off value for the vehicles identified in Exhibit 13 (customers' names have been redacted), is $216,948.03**.**

77.     As a result of Elmhurst's continued willful and malicious acts designed to withhold funds from Ford Credit for the leased vehicles, Ford Credit instituted another legal action against Elmhurst and its general manager, John Moroni, in the Circuit Court of DuPage County, styled *Ford Motor Credit Company v. Elmhurst Lincoln Mercury, and John Moroni*, Case No. 09 CH 5488 ("Chancery Litigation").

78.     In the Chancery Litigation, Ford Credit obtained a TRO on November 25, 2009, which precluded Elmhurst and John Moroni from selling leased vehicles titled in the name of Ford Credit and returned to the Elmhurst at the end of the lease, without remitting proceeds from the sale to Ford Credit.  *See* Exhibit 14, November 25, 2009 Court Order.  Subsequently, Ford Credit obtained a preliminary injunction against John Moroni and Elmhurst precluding the same conduct by Elmhurst and John Moroni throughout the pendency of the Chancery Litigation.  *See* Exhibit 15, December 17, 2009 Court Order.

79.     Elmhurst violated the preliminary injunction when it did not remit sale proceeds to Ford Credit.

80.     On or about January 20, 2010, customer Roger Sewell (Account No. XXXX5353) returned a leased vehicle to Elmhurst.  Mr. Sewell paid $18,989.11 to Elmhurst to purchase the leased vehicle.  However, Elmhurst did not remit payment to Ford Credit.  The payoff amount due on the vehicle, at this time, to Ford Credit was $18,282.71.

14

81.    On or about January 26, 2010, customer Rosie Mays (Account No. XXXX4283) returned a leased vehicle to Curie Motor Chevrolet, Inc.  Curie Motors, in turn, forwarded a pay-off check in the amount of $17,374.72 to Elmhurst.   However, Elmhurst did not remit payment to Ford Credit.  The payoff amount due on the vehicle, at this time, to Ford Credit was $17,476.15.

82.    On or about February 10, 2010, customer Beth Thorsen (Account No. XXXX7102) returned a leased vehicle to Autobarn, Ltd.  Autobarn, Ltd., in turn, forwarded a payoff check in the amount of $24,965.38 to Elmhurst.  However, Elmhurst did not remit payment to Ford Credit.  The payoff amount due on the vehicle, at this time, to Ford Credit was $25,004.96.

83.    On or about February 18, 2010, a corporate customer, Yorktown Holdings ("Yorktown") (Account No. XXXX3491), returned a leased vehicle to Elmhurst.  Yorktown paid $25,276.11 to Elmhurst to purchase the leased vehicle.   However, Elmhurst did not remit payment to Ford Credit.  The payoff amount due on the vehicle, at this time, to Ford Credit was $23,562.25.

84.    The proceeds from the sale of each vehicle were deposited into Account No. XXXXX4513 at Suburban Bank & Trust.  Upon information and belief, Elmhurst is the holder of this account.  As a result of the aforementioned sales, Elmhurst was required to pay Ford Credit the amount of $84,326.07, but failed to do so as required under the Retail Lease Plan.

85.    Upon information and belief, Elmhurst retained the funds from the sale of the foregoing vehicles to prevent Ford Credit from recovering monies due to it.

86.    As owner and officer of Elmhurst, Defendant actively participated in Elmhurst's failure to turn over the sale proceeds to Ford Credit.

87.     Defendant's conduct amounted to a willful and malicious conversion of the vehicles that were sold.

88.     Defendant knew that the conversion of the vehicles would cause harm to Ford Credit, namely that Ford Credit would be prevented from recovering funds to pay off the outstanding debt owed by Elmhurst.

<u>Willful and Malicious Concealment of Vehicle</u>

89.     Moreover, despite the Replevin Action filed against Elmhurst, the dealership continued to conceal from Ford Credit at least one (1) vehicle to prevent Ford Credit from liquidating the same.

90.     The initial Order of Replevin entered in the Replevin Action directed Elmhurst to turnover all vehicles in its possession to Ford Credit. *See* Exhibit 9, September 15, 2008 Order of Replevin.  Notwithstanding that Order, Elmhurst prevented Ford Credit from taking possession of a Navigator, Vehicle Identification Number 5LMFU28587LJ10256 ("Navigator").

91.     In precluding Ford Credit from obtaining this vehicle, Elmhurst willfully and maliciously prevented Ford Credit from selling the vehicle at auction to reduce the debt owed by Elmhurst.

92.     Defendant knew, as owner and officer, that Ford Credit would be harmed by Elmhurst's willful and malicious concealment of the vehicle from Ford Credit, namely that Ford Credit would be unable to sell that vehicle to further reduce the outstanding debt owed by Elmhurst.

<u>Improper Re-Direction of Dealership Sale Proceeds</u>

93.     Defendant entered into an agreement to sell Elmhurst for approximately $500,000.00.  Although Elmhurst is a corporate entity, provisions of the sale agreement directed

16

80% of the sale proceeds to John Moroni (Defendant's ex-husband) and Defendant, who was the corporate secretary.

94.    At the time of the sale of the dealership, John Moroni and Defendant were married.

95.    By directing 80% of the sale proceeds to herself and her then spouse, Defendant continued to divert funds from Ford Credit that, through the ordinary sale process, would normally have gone to Ford Credit.

96.    Furthermore, on May 19, 2010, as a result of Ford Credit's challenge to the proposed sale, the court in the Chancery Litigation entered an Order directing that any proceeds from the sale of the dealership are to be held in escrow. *See* Exhibit 16, May 19, 2010 Court Order.

### Failure to Return Rebate Check

97.    In addition to the SOTs and sold lease vehicles, in or about July 2009, while Defendant was an owner and officer of Elmhurst, Elmhurst received a $120,000 rebate check ("rebate check") from Ford Motor Company.

98.    This check was supposed to go to Ford Credit because of the outstanding debt owed by Elmhurst to Ford Credit.

99.    At all times, Defendant was aware that the rebate check was to be remitted to Ford Credit.

100.    However, when Defendant received the rebate check, instead of remitting the check to Ford Credit, Defendant knowingly allowed the check to be cashed.

101.    Ford Credit repeatedly demanded that Defendant give the funds to Ford Credit.

102.    However, Defendant never gave the funds to Ford Credit, despite the requirement to do so.

## COUNT I
## <u>OBJECTION TO DISCHARGEABILITY PURSUANT TO §523(A)(4)</u>
### (Defendant's Defalcation while Acting in a Fiduciary Capacity as to Melrose and Elm)

103.    Ford Credit re-alleges and incorporates by reference the allegations of ¶¶ 1 through 102, as if fully restated in this paragraph.

104.    Pursuant to the respective Wholesale Agreements, Melrose and Elm were required to hold the sale proceeds of the sale of all vehicles in trust for the benefit of Ford Credit.

105.    Under the Guaranty, Defendant had a fiduciary relationship to Ford Credit while acting on behalf of Melrose and Elm.

106.    Defendant, acting on behalf of Melrose and Elm, and with full knowledge of Melrose's and Elm's affirmative duties under the respective Wholesale Agreement, caused Melrose and Elm to violate its duty to pay over the sale proceeds of the SOT vehicles to Ford Credit.

107.    Defendant's actions constitute a defalcation while acting in a fiduciary capacity.

108.    Accordingly, the debt owed by Defendant to Ford Credit pursuant to the Guaranty is non-dischargeable pursuant to 11 U.S.C. section 523(a)(4).

## COUNT II
## <u>OBJECTION TO DISCHARGEABILITY PURSUANT TO §523(A)(4)</u>
### (Defendant's Defalcation while Acting in a Fiduciary Capacity as to Elmhurst)

109.    Ford Credit re-alleges and incorporates by reference the allegations of ¶¶ 1 through 108, as if fully restated in this paragraph.

110.    Pursuant to the Wholesale Agreement, Elmhurst was required to hold the sale proceeds of the sale of all vehicles in trust for the benefit of Ford Credit.

111.    As a result of the Wholesale Agreement, a fiduciary relationship existed between Defendant, as owner of Elmhurst, and Ford Credit.

112.    Defendant, acting on behalf of Elmhurst, and with full knowledge of Elmhurst's affirmative duties under the Wholesale Agreement, caused Elmhurst to violate its duty to pay over the sale proceeds of the SOT vehicles to Ford Credit.

113.    Defendant's actions constitute a defalcation while acting in a fiduciary capacity.

114.    Accordingly, the debt owed by Defendant to Ford Credit is non-dischargeable pursuant to 11 U.S.C. section 523(a)(4).

## COUNT III
## OBJECTION TO DISCHARGEABILITY PURSUANT TO §523(A)(4)
### (Defendant's Embezzlement as to Melrose and Elm)

115.    Ford Credit re-alleges and incorporates by reference the allegations of ¶¶ 1 through 114, as if fully restated in this paragraph.

116.    Pursuant to the respective Wholesale Agreements, Melrose and Elm were required to hold the sale proceeds of the sale of all vehicles in trust for the benefit of Ford Credit.

117.    Defendant fraudulently misappropriated the sale proceeds for the SOT vehicles and directed such funds to her personal use, despite her knowledge that such funds were required to be held in trust for the sole benefit of Ford Credit pursuant to the respective Wholesale Agreements.

118.    Defendant's actions constitute embezzlement, as that term is used in 11 U.S.C. section 523(a)(4).

119.    Accordingly, the debt owed by Defendant to Ford Credit is non-dischargeable pursuant to 11 U.S.C. section 523(a)(4).

## COUNT IV
## OBJECTION TO DISCHARGEABILITY PURSUANT TO §523(A)(4)
### (Defendant's Embezzlement as to Elmhurst)

120.    Ford Credit re-alleges and incorporates by reference the allegations of ¶¶ 1 through 119, as if fully restated in this paragraph.

121.    Pursuant to the Wholesale Agreement, Elmhurst was required to hold the sale proceeds of the sale of all vehicles in trust for the benefit of Ford Credit.

122.    Defendant fraudulently misappropriated the sale proceeds for the SOT vehicles and directed such funds to her personal use, despite her knowledge that such funds were required to be held in trust for the sole benefit of Ford Credit pursuant to the Wholesale Agreement.

123.    Defendant's actions constitute embezzlement, as that term is used in 11 U.S.C. section 523(a)(4).

124.    Accordingly, the debt owed by Defendant to Ford Credit is non-dischargeable pursuant to 11 U.S.C. section 523(a)(4).

## COUNT V
## OBJECTION TO DISCHARGEABILITY PURSUANT TO §523(A)(6)
### (Defendant's Willful and Malicious Conduct as to Melrose, Elm and Elmhurst)

125.    Ford Credit re-alleges and incorporates by reference the allegations of ¶¶ 1 through 124, as if fully restated in this paragraph.

126.    Defendant, as an owner, officer and/or manager of Melrose, Elm and Elmhurst, actively participated in the conversion of property subject to the security interest of Ford Credit.

127.    Defendant's failure to pay Ford Credit the sale proceeds of vehicles sold out of trust prevented Ford Credit from recovering monies that, in the ordinary sale process, would normally go to Ford Credit.  This conduct caused an injury to Ford Credit's interest in the vehicles.

128.    Defendant's conversion of sale proceeds from vehicles sold out of trust, and the resulting injury to Ford Credit's interest in those vehicles, was the result of the Defendant's willful misconduct, in that she  intended to cause injury to Ford Credit's interest in the vehicles.

129.    Defendant's conversion of sale proceeds from vehicles sold out of trust and the resulting injury to Ford Credit's interest in the vehicles was malicious, in that Defendant acted

with a conscious disregard of her duties with respect to the property interest of Ford Credit.  In the alternative, the Defendant acted without just cause or excuse.

130.    Defendant's concealment of the Navigator is a willful and malicious act designed to prevent Ford Credit from receiving the payments to which it is entitled.

131.    Defendant acted with full knowledge that conversion of property through sales out of trust, directing proposed sale proceeds of the dealership to family members and concealment of another vehicle, to which Ford Credit had a right to possess, constituted willful and malicious injury to the property of Ford Credit.

**WHEREFORE**, Plaintiff, Ford Motor Credit Company LLC, by and through its undersigned counsel, prays this Court for entry of an order declaring the debt owed by the Defendant, John F. Moroni, to Ford Motor Credit Company LLC in an amount to be determined but in no event less than Two Million Seven Hundred Ninety-Seven Thousand Seven Hundred Sixty-Eight Dollars and 09/100's ($2,797,768.09), to be non-dischargeable under Sections 523(a)(4) and 523(a)(6) of the Bankruptcy Code, and for such other and further relief as the Court deems just.

Respectfully submitted,
Dykema Gossett PLLC


 /s/ Gregory L. Lacey
One of the Attorneys for Ford Motor
Credit Company LLC

Richard M. Bendix, Jr.
Gregory L. Lacey
Maria A. Diakoumakis
DYKEMA GOSSETT PLLC
10 S. Wacker Drive, Ste. 2300
Chicago, Illinois 60606
(312) 876-1700

CHICAGO\2984180.8
ID\GLL - 088064/0999